**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| EMANUELE CAROLEO, | ) | **CIVIL ACTION NO**.: |
| | ) | |
| Plaintiff, | ) | 20-cv-4770 (JMF) |
| | ) | |
| v. | ) | |
| | ) | |
| ESTEE LAUDER, INC., THE BOARD OF | ) | |
| DIRECTORS OF ESTEE LAUDER INC., | ) | |
| ESTEE LAUDER INC. FIDUCIARY | ) | |
| INVESTMENT COMMITTEE, THE | ) | **CIVIL ACTION NO**.: |
| EMPLOYEE BENEFITS COMMITTEE OF | ) | |
| ESTEE LAUDER, INC. and JOHN DOES 1–30, | ) | 20-cv-5779 (JMF) |
| | ) | |
| Defendants. | ) | **Hon. Jennifer L. Rochon** |
| | ) | |
| KATHY L. GANDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ESTEE LAUDER, INC., THE BOARD OF | ) | |
| DIRECTORS OF ESTEE LAUDER INC., | ) | |
| ESTEE LAUDER INC. FIDUCIARY | ) | |
| INVESTMENT COMMITTEE, THE | ) | |
| EMPLOYEE BENEFITS COMMITTEE OF | ) | |
| ESTEE LAUDER, INC. and JOHN DOES 1-30, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Emanuele Caroleo and Kathy L. Gandy ("Plaintiffs"), by and through their

attorneys, on behalf of the Estee Lauder Companies 401(k) Savings Plan (the "Plan"),[1] themselves

and all others similarly situated, state and allege as follows.

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

# I.   INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Estee Lauder, Inc., ("Estee Lauder," or the "Company"), the Board of Directors of Estee Lauder Inc. ("Board") and its members during the Class Period, the Estee Lauder Inc. Fiduciary Investment Committee ("Fiduciary Committee") and its members during the Class Period for breaches of their fiduciary duties and the Estee Lauder Inc. Employee Benefits Committee ("Benefits Committee").

2.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F. 2d 263, 272 n.8 (2d Cir. 1982); *see also Severstal Wheeling v. WPN Corporation*, 659 Fed.Appx. 24 (2d Cir. 2016).

3.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

4.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b).[2]

5.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

6.     Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

7.     The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  "*A Look at 401(k) Plan Fees*," *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

8.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating

---

[2] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.      The Plan has at all times, during the Class Period maintained over $1.2 billion in assets (including having over $1.6 billion in assets in 2018), qualifying it as a mega plan in the defined contribution plan marketplace, and among the largest plans in the United States. Between 2014 and 2018 (the latest data available), the Plan maintained between $489 million and $1.06 billion in JPMorgan collective trusts (described in further detail below). These assets are entrusted to the care of the Plan's fiduciaries. As a mega plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

10.     Plaintiffs allege that during the putative Class Period (June 22, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (2) maintaining certain funds in the Plan despite the availability of identical or materially similar investment options with lower costs and/or better performance histories; and (3) failing to monitor and control the Plan's recordkeeping expenses.

11.     In many instances, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan as alternatives to the mutual funds in the Plan, despite their lower fees and materially similar investment objectives.

12.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. §

1104. Their actions were contrary to the actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15. This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16. Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

**Plaintiffs**

17. Plaintiff, Emanuele Caroleo ("Caroleo"), resides in Cutler Bay, Florida.  Plaintiff Caroleo is a former employee of Estee Lauder.  During his employment, Plaintiff Caroleo participated in the Plan, investing in the options offered by the Plan, which are the subject of this lawsuit.

18.     Plaintiff Kathy L. Gandy ("Gandy"), a resident of Livingston, Texas, has been employed by Estee Lauder since 2008.  During her employment, Plaintiff Gandy participated in the Plan, investing in the options offered by the Plan, which are the subject of this lawsuit.

19.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

20.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

21.     Further, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").  Moreover, having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of

reasonable fee levels and prudent investment and recordkeeping alternatives available to such plans.  For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### Defendants

### Company Defendant

22.     Estee Lauder is the Plan sponsor.  *See* 2018 Form 5500 at 1.  The corporate headquarters of Estee Lauder is located at 28 W. 23rd Street, 8th Floor, New York, New York. Estee Lauder as the Plan sponsor of the Estee Lauder Companies 401(k) Savings Plan describes itself as "one of the world's leading manufacturers and marketers of quality skin care, makeup, fragrance and hair care products." The June 30, 2019 Annual Report of the Estee Lauder Companies Inc. ("2019 Annual Report") at 3.

23.     The 2019 Annual Report further provides: "[o]ur products are sold in approximately 150 countries and territories under a number of well-known brand names including: Estée Lauder, Clinique, Origins, MžAžC, Bobbi Brown, La Mer, Jo Malone London, Aveda and Too Faced." *Id.*   As of June 30, 2019, Estee Lauder "had approximately 48,000 full time employees worldwide," (2019 Annual Report at 11), and more than $1.7 billion in earnings.  2019 Annual Report at 22.

24.     Estee Lauder, acting through its Board of Directors, appointed the Fiduciary Committee and the Benefits Committee.  As stated in the Plan document "[t]he Benefits Committee and the Fiduciary Committee each shall consist of at least three (3) members who shall be appointed annually in the manner authorized by the Board of Directors." The Estee Lauder Companies 401(k) Savings Plan as Amended and Restated Generally Effective as of January 1, 2015 ("Plan Doc.") at 53.

25.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.  Estee Lauder Inc. is a wholly owned subsidiary of the Estee Lauder Companies Inc. *See* 2019 Annual Report at Exhibit 21.1.

26.     Lastly, Estee Lauder has discretionary authority to terminate matching contributions entirely.  As stated in the Plan Doc, Estee Lauder may "terminate … all further contributions to the Trust Fund for any reason at any time." Plan Doc at 61.

27.     For all the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

28.     The Board of Directors appointed the members of the Fiduciary Committee and the Benefits Committee.  Plan Doc. at 53.  Accordingly, the Board had the fiduciary duty to monitor and supervise the Fiduciary Committee and the Benefits Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

29.     Each member of the Board during the Class Period (referred to herein as John Does 1-10) is or was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and/or monitor the Fiduciary Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     The Board and its members during the Class Period are collectively referred to herein as the "Board Defendants."

### Fiduciary Committee Defendants

31.     As detailed above, the Fiduciary Committee is appointed by the Board.  The Committee is responsible for investing and selecting the funds which are available to Plan participants for investment.  The Plan Document states that: "[t]he Fiduciary Committee shall have

the authority to … choose the investments into which Participants may direct the investment of their Accounts." Plan Doc. at 54.  In addition, "[t]he Fiduciary Committee shall review the Plan's investment funds at least annually." *Id.*

32.     The Fiduciary Committee is governed by the Investment Policy Statement which further details the Fiduciary Committee's responsibilities.  *See* The Estee Lauder Companies 401(k) Savings Plan Trust Investment Policy Statement Updated as of March 2019 ("IPS"). The IPS provides that the Fiduciary Committee "has responsibility for assisting in the administration of the Plan with respect to investment matters, including the following matters: evaluating investment options; and selecting investment options." IPS at 2.

33.     The Fiduciary Committee is also responsible for appointing the Plan trustee. The Plan Document provides: "[t]he Fiduciary Committee shall have the authority to … choose the Trustee." *Id.*   Here, the Fiduciary Committee has appointed and retained the Northern Trust Company ("Northern Trust"). SPD at 24.

34.     The Fiduciary Committee is also responsible for monitoring service providers to the Plan. As stated in Fiduciary Committee's Charter: "[a]ll service providers retained by the Committee will be monitored regularly, which shall include a review of their fees and results." The Charter of the Fiduciary Investment Committee of Estee Lauder, Inc. as ratified by the Board of Directors of Estee Lauder, Inc. on June 29, 2016 ("Fiduciary Committee Charter") at 4.

35.     In addition, "the Fiduciary Committee may work with the Employee Benefits Committee and the Global Retirement Finance Committee of the Sponsor Company as needed pursuant to the charters of each such Committee." *Id* at 4. The Fiduciary Committee does in fact work with the Benefits Committee with regard to recordkeeping matters for the Plan.

36.     The Fiduciary Committee and each of its members have been fiduciaries of the Plan throughout the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. §

1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

37.     The Fiduciary Committee and members of the Committees during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Fiduciary Committee Defendants."

<u>**Benefits Committee Defendants**</u>

38.     As detailed above, the Benefits Committee is appointed by the Board.  Pursuant to its Charter, the Benefits Committee "may appoint a Plan administrator for each employee benefit plan and shall delegate to the Plan administrator the duty to maintain all records and accounts necessary for the effective administration of the such plan…." The Charter of the Employee Benefits Committee of Estee Lauder, Inc. The Benefits Committee has in fact appointed an administrator whose duty it is to maintain all records and accounts for the Plan.

39.     The Benefits Committee and each of its members have been fiduciaries of the Plan throughout the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

40.     The Benefits Committee and members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Benefits Committee Defendants."

<u>**Additional John Doe Defendants**</u>

41.     To the extent that there are additional officers and employees of Estee Lauder who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek

leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Estee Lauder officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV.    THE PLAN

42.    The SPD states that The Estee Lauder Companies 401(k) Savings Plan (the "Plan") was designed "to make it easy for you to save for your future financial security." SPD at 1.

43.    The Plan "is a contributory defined contribution plan covering substantially all regular full-time employees … ." Estee Lauder Companies 401(k) Financial Statements for December 31, 2018 and 2017 at 5 (2018 Auditor Report).

44.    The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA Section  3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  *Id.*  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

### *Eligibility*

45.    As detailed in the 2018 Auditor Report, employees are eligible to participate in the Plan when they "have completed 30 days of service … as defined in the Plan document."  *Id.*  The Plan Document provides: "[e]very Employee regularly scheduled to work at least 30 hours per week and who is not a temporary employee shall be eligible to participate hereunder 30 days after his date of hire … ." Plan Doc. at 12.

***Contributions and Vesting***

46.     There are several types of contributions that can be added to a participant's account: an employee salary deferral contribution and an employer matching contribution. SPD at 1. Participants can also roll over amounts from other qualified benefit or defined contribution plans. SPD at 5.

47.     As detailed in the 2018 Auditor Report: "Participants can contribute from 2% to 50%, in 1% increments, of their compensation, as defined in the Plan document, through payroll deductions subject to certain limitations." 2018 Auditor Report at 5. The 2018 Auditor Report further provides that "[t]he Company matches 100% of a participant's contribution up to the first 3% of eligible compensation and 50% of a participant's contribution on the next 4% of eligible compensation." *Id.*

48.     "Participants are immediately vested in their contributions plus actual earnings thereon." 2018 Auditor Report at 6. "Participants are also immediately vested in the Company's matching contributions, and any investment earnings thereon." *Id.*

49.     Like other companies that sponsor 401(k) plans for their employees, Estee Lauder enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made.   *See generally* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

50.     Estee Lauder also benefits in other ways from the Plan's matching program.  It is well-known that "[m]any employers match their employees' contributions to the 401(k) plan in order to help attract and retain talent at their company.  By hiring and retaining employees with a high-caliber of talent, [a company] may save money on training and attrition costs associated with

unhappy or lower-performing workers." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

51.     Given the size of the Plan, Estee Lauder likely enjoyed a significant tax and cost savings from offering a match.

### The Plan's Investments

52.     Several investments were available to Plan participants for investment each year during the putative Class Period, including several JPMorgan target date funds.  As noted above, the Committee determines the appropriateness of the Plan's investment offerings and monitors investment performance.  Plan Doc. at 54.  For 2018, the Plan, excluding investments in common stock, offered 19 investment options, which included 14 collective trusts, 4 mutual funds and 1 stable value fund.

53.     The Plan's assets under management for all funds as of the end of 2018 was $1,645,339,326.   2018 Auditor Report at 4.   From 2014 to 2017 the Plan's assets under management ranged from more than $1.2 billion to more than $1.7 billion.

### Plan Expenses

54.      Expenses of maintaining the Plan are paid directly by the Plan. Plan Doc. at 56. The Plan Document provides: "[a]ll reasonable and necessary expenses incurred in the administration of the Plan and Trust Fund shall be paid from the Trust Fund." *Id.*

### V.     CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[3]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at

---

[3] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

any time between June 22, 2014 through the date of judgment (the "Class Period").

56.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 16,741 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at 2.

57.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

58.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

(a)  Whether Defendants are/were fiduciaries of the Plan;

(b)  Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

(c)  Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

(d)  The proper form of equitable and injunctive relief; and

(e)  The proper measure of monetary relief.

59.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no

interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the

vigorous prosecution of this action and anticipate no difficulty in the management of this litigation

as a class action.

60.     This action may be properly certified under Rule 23(b)(1).  Class action status in

this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the

members of the Class would create a risk of establishing incompatible standards of conduct for

Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of

separate actions by the members of the Class would create a risk of adjudications with respect to

individual members of the Class that, as a practical matter, would be dispositive of the interests of

other members not parties to this action, or that would substantially impair or impede their ability

to protect their interests.

61.     In the alternative, certification under Rule 23(b)(2) is warranted because the

Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect

to the Class as a whole.

## VI.     DEFENDANTS' FIDUCIARY STATUS
## AND OVERVIEW OF FIDUCIARY DUTIES

62.     ERISA requires every plan to provide for one or more named fiduciaries who will

have "authority to control and manage the operation and administration of the plan."  ERISA §

402(a)(1), 29 U.S.C. § 1102(a)(1).

63.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under

Section 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary

functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority

or discretionary control respecting management of such plan or exercises any authority or control

respecting management or disposition of its assets, (ii) he renders investment advice for a fee or

other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

64.    As described in the "Parties" section above, Defendants were fiduciaries of the Plan because:

      (a)  they were so named; and/or

      (b)  they exercised authority or control respecting management or disposition of the Plan's assets; and/or

      (c)  they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

      (d)  they had discretionary authority or discretionary responsibility in the administration of the Plan.

65.    As fiduciaries, Defendants are or were required by ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence and are "the highest known to the law." *Donovan*, 680 F. 2d at 272 n.8; *see also Severstal Wheeling*, 659 Fed.Appx. 24.

66.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests

of third persons." *Id.,* at 224 (quotation marks and citations omitted).  Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries  . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan."  Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

67.    In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of himself or third persons.

68.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets."  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments."  *Tibble*, 135 S. Ct. at 1828.

69.    In addition, ERISA Section 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary"), further provides that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

70.     During the Class Period, Defendants did not act in the best interests of the Plan participants.  Investments chosen for a plan are not to favor the fund provider over the plan's participants.  Yet here, to the detriment of the Plan and its participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many mutual fund investments that were more expensive than necessary and otherwise not justified on the basis of their economic value to the Plan or Plan participants.

71.     Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.  Additionally, Defendants failed to leverage the size of the Plan to negotiate for: (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

72.      As discussed below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## VII.    SPECIFIC ALLEGATIONS

### A. Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds

73.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the Plan and participant's assets because of unnecessary costs.

74.     Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative

investments that may have "significantly different costs."  Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").  Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings.  *Pension Ben. Gaur. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718-19 (2d Cir. 2013).

75.     Investment options have a fee for investment management and other services.  With regards to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

76.     When large plans, particularly those with over a billion dollars in assets like the Plan here, have options which approach the retail cost of shares for individual investors or are simply more expensive than the average or median institutional shares for that type of investment, a careful review of the plan and each option is needed for the fiduciaries to fulfill their obligations to the plan participants.

77.     The Plan has retained several actively-managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that these funds had become imprudent due to their higher costs relative to the same or similar investments

available.   This fiduciary failure decreased participant compounding returns and reduced the available amount participants will have at retirement.

78.     During the Class Period, the Plan lost millions of dollars by offering investment options that had similar or identical characteristics to other lower-priced investment options.

79.     The majority of funds in the Plan stayed relatively unchanged during the Class Period.  In 2018, nearly half of the funds in the Plan (at least 9 out of the Plan's 19 funds) were significantly more expensive than comparable funds found in similarly-sized plans (plans having over a billion dollars in assets).  As illustrated in the chart below, the expense ratios for funds in the Plan in some cases were up to *57%* (in the case of the Dodge & Cox Stock) above the median expense ratios in the same category.

| Current Fund | Exp Ratio[4] | Category | ICI Median[5] |
|---|---|---|---|
| Dodge & Cox Stock | 0.52 % | Domestic Equity | 0.33% |
| JPMorgan SmartRetirement 2035 | 0.52 % | Target-date | 0.47% |
| JPMorgan SmartRetirement 2045 | 0.53 % | Target-date | 0.47% |
| JPMorgan SmartRetirement 2050 | 0.53 % | Target-date | 0.47% |
| JPMorgan SmartRetirement 2040 | 0.53 % | Target-date | 0.47% |
| JPMorgan SmartRetirement 2025 | 0.49 % | Target-date | 0.47% |
| JPMorgan SmartRetirement 2030 | 0.51 % | Target-date | 0.47% |
| JPMorgan SmartRetirement  2055 | 0.53 % | Target-date | 0.47% |
| JPMorgan SmartRetirement 2060 | 0.53 % | Target-date | 0.47% |

---

[4] The listed expense figures are as of 2018.
[5] *See* BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

80.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the above ICI Median fee is based on a study conducted in 2016 when expense ratios were generally higher than fees today or even in 2018 given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for target date funds for plans with over $1 billion in assets was 0.56% using 2015 data compared with 0.47% in 2016.   Accordingly, 2018 median expense ratios would be lower than indicated above, demonstrating a greater disparity between the Plan's 2018 expense ratios charted above and the median expense ratios in the same category.

81.     Further, median-based comparisons also understate the excessiveness of the investment management fees of the Plan's funds because many prudent alternative funds were available that offered lower expenses than the median.

### *Failure to Investigate Availability of Lower Cost Collective Trusts*

82.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

83.     Collective trusts, also referred to as CITs, are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

84.     As noted *supra*, ERISA is derived from trust law.  *See Tibble*, 135 S. Ct. at 1828. Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek

guidance from trust law.  *See Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996).  One such area is the selection of appropriate funds for a plan.  Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case."  Restatement (Third) of Trusts, § 100 cmt. b(1).  To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  *Id.* (emphasis added).

85.    Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.[6]  Defendants knew this because one of the primary investment vehicles for this Plan are collective trust target date funds.[7]

---

[6] Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise or issue formal prospectuses. As a result, their costs are much lower, with lower or no administrative costs, and lower or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

[7] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter "*CITs Gaining Ground*"). Many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual funds. *Use of CITs in DC Plans Booming; CITs Gaining Ground*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015,

86.     In 2018 alone, over a billion dollars of Plan assets were invested in private label collective trust target date funds offered by JPMorgan.  Defendants, however, breached their fiduciary duties by failing to continually monitor the investment management fees of the target date funds to ensure they were reasonable.  During the Class Period, the expense ratios of the JPMorgan target date funds were more expensive than the Plan could and should have obtained given its bargaining power.  As reported on the Plan's forms 5500, the JPMorgan target date funds had the following expense ratios:

| Fund | 2018 | 2017 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| JPMorgan Smart Retirement Fund 2025 | 0.49% | 0.52% | 0.57% | 0.62% | 0.62% |
| JPMorgan Smart Retirement Fund 2030 | 0.51% | 0.55% | 0.59% | 0.67% | 0.67% |
| JPMorgan Smart Retirement Fund 2035 | 0.52% | 0.57% | 0.61% | 0.72% | 0.72% |
| JPMorgan Smart Retirement Fund 2040 | 0.53% | 0.59% | 0.63% | 0.75% | 0.75% |
| JPMorgan Smart Retirement Fund 2045 | 0.53% | 0.60% | 0.63% | 0.75% | 0.75% |
| JPMorgan Smart Retirement Fund 2050 | 0.53% | 0.60% | 0.635% | 0.75% | 0.75% |
| JPMorgan Smart Retirement Fund 2055 | 0.53% | 0.60% | 0.63% | 0.75% | 0.40% |
| JPMorgan Smart Retirement Fund 2060 | 0.53% | 0.60% | | | |

---

at    1,    available    at    https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

87.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available lower cost collective trusts.  As demonstrated in the chart below, while the target date funds in the Plan are collective trusts, they are private label collective trusts with much higher expense ratios than the typical collective trusts offered by JPMorgan.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified these lower cost collective trusts at the earliest opportunity.  Here, the following funds in the Plan in 2018 were available as lower cost collective trusts in 2018 and most of the Class Period:

| Fund in Plan | Exp. Ratio[8] | Lower Cost Version | Incep Date | Exp. Ratio[9] | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan Smart Retirement Fund 2025 | 0.49% | JPMCB Smart Retirement 2025 Fund - CF Class | July 22, 2016 | 0.44% | 11% |
| JPMorgan Smart Retirement Fund 2030 | 0.51% | JPMCB Smart Retirement 2030 Fund - CF Class | July 22, 2016 | 0.44% | 15% |
| JPMorgan Smart Retirement Fund 2035 | 0.52% | JPMCB Smart Retirement 2035 Fund - CF Class | July 22, 2016 | 0.44% | 18% |
| JPMorgan Smart Retirement Fund 2040 | 0.53% | JPMCB Smart Retirement 2040 Fund - CF Class | July 22, 2016 | 0.44% | 20% |
| JPMorgan Smart Retirement Fund 2045 | 0.53% | JPMCB Smart Retirement 2045 Fund - CF Class | July 22, 2016 | 0.44% | 20% |
| JPMorgan Smart Retirement Fund 2050 | 0.53% | JPMCB Smart Retirement 2050 Fund - CF Class | July 22, 2016 | 0.44% | 20% |

---

[8] The listed expense figures are as of 2018.
[9] The listed expense figures are as of 2019.

| | | | | | |
|---|---|---|---|---|---|
| JPMorgan Smart Retirement Fund 2055 | 0.53% | JPMCB Smart Retirement 2055 Fund - CF Class | July 22, 2016 | 0.44% | 20% |
| JPMorgan Smart Retirement Fund 2060 | 0.53% | JPMCB Smart Retirement 2060 Fund - CF Class | July 22, 2016 | 0.44% | 20% |

88.    The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of these available collective trusts and therefore also should have immediately identified the imprudence of failing to transfer the Plan's funds into these alternative investments.

89.    As noted above, minimum initial investment amounts are typically waived for institutional investors like retirement plans.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, 960 F.3d 478, 483 (8th Cir. May 22, 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda,* 923 F.3d at 329 (citing *Tibble*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).  Here in fact, there was no minimum investment required for the CF Class.  *See* June 2019 Fund Summary for JPMCB SmartRetirement Funds, at p. 13.

90.    The following is a sampling of the assets under management during the Class Period:

| Fund in Plan | 2018 AUM | 2017 AUM | 2016 AUM | 2015 AUM | 2014 AUM |
|---|---|---|---|---|---|
| JPMorgan Smart Retirement Fund 2025 | $87,210,899 | $96,654,121 | $85,316,626 | $71,268,010 | $63,854,329 |
| JPMorgan Smart Retirement Fund 2030 | $98,755,078 | $105,871,002 | $83,888,650 | $72,214,272 | $64,575,029 |
| JPMorgan Smart Retirement Fund 2035 | $93,361,390 | $96,759,834 | $77,432,270 | $64,547,222 | $57,776,364 |

| JPMorgan Smart Retirement Fund 2040 | $87,507,532 | $92,223,873 | $72,841,501 | $60,614,811 | $53,195,651 |
|---|---|---|---|---|---|
| JPMorgan Smart Retirement Fund 2045 | $88,407,255 | $90,057,677 | $69,431,876 | $57,818,662 | $50,546,492 |
| JPMorgan Smart Retirement Fund 2050 | $87,650,401 | $91,414,102 | $69,532,419 | $57,471,782 | $48,521,804 |
| JPMorgan Smart Retirement Fund 2055 | $15,350,098 | $11,435,336 | $5,222,138 | $1,537,062 | $137,228 |
| JPMorgan Smart Retirement Fund 2060 | $2,614,654 | $80,556 | -- | -- | -- |

91.     At all times during the Class Period, the above funds had sufficient assets under management to qualify for the lower-cost collective trusts identified above especially given the fact that investment managers will waive investment minimums for retirement plans.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper available collective trusts and transferred the Plan's investments into the lower cost funds at the earliest opportunity.

92.     There is no good-faith explanation for utilizing higher-cost funds when lower-cost funds are available for the exact same investment.  Indeed, given that the collective trusts were comprised of the same underlying investments as their mutual fund counterparts, and managed by the same investment manager, but had lower fees, they would have had greater returns than the Plan's funds.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive funds; the only consequence was higher costs for Plan participants.

93.     Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

94.     Moreover, it is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 8 (C.D. Cal. Aug. 16, 2017).  Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing."  *Id.*, at * 11.  The failure to adhere to this basic tenet of good fiduciary practice resonates loudly in this case especially where the recordkeeping and administrative costs were unreasonably high as discussed below.  A fiduciary's task is to negotiate and/or obtain reasonable fees for investment options and recordkeeping/administration fees independent of each other if necessary.

95.     By failing to investigate the availability of lower cost collective trusts as early as 2016, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### *Failure to Utilize Lower Cost Passively or Actively Managed Funds*

96.     As noted *supra*, ERISA is derived from trust law.  *See Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts, § 100 cmt. b(1).

97.     While higher-cost mutual funds may outperform a less-expensive option, such as a passively-managed index fund, over the short term, they rarely do so over a longer term.  *See* Jonnelle Marte, *Do Any Mutual Funds Ever Beat the Market?  Hardly*, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices which looked at 2,862 actively-managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also Index funds trounce actively managed*

*funds: Study*, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html ("long-term data suggests that actively-managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

98.    Indeed, on average, funds with high fees perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

99.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options.  This failure is a further indication that Defendants lacked a prudent investment monitoring process.

100.    The chart below demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable passively-managed alternative funds in the same fund category.  The chart below analyzes funds in the Plan in 2018 using 2018 expense ratios as a methodology to demonstrate the greater relative expense of the Plan's funds compared to their alternative fund counterparts.

| Fund in Plan | Net Expense Ratio | Passive/Active Lower Cost Alternative | Net Expense Ratio[10] | Inception Date | % Fee Excess |
|---|---|---|---|---|---|
| Dodge & Cox Stock | 0.52 % | Vanguard Value Index I | 0.04 % | 07/02/1998 | 1200.0% |
| | 0.52 % | Vanguard Equity-Income Adm | 0.18 % | 08/13/2001 | 188.9% |

---

[10] As of June 1, 2019, Fidelity Freedom Index Funds – Investor Class' expenses were reduced to 0.12% from 0.14%.

| | | | | | |
|---|---|---|---|---|---|
| DFA Global Equity I | 0.30 % | Vanguard Total World Stock Index I | 0.08 % | 10/09/2008 | 275.0% |
| | | | | | |
| JPMorgan SmartRetirement 2035 | 0.52 % | Fidelity Freedom Index 2035 Investor | 0.12 % | 10/02/2009 | 333.3% |
| | 0.52 % | American Funds 2035 Trgt Date Retire R6 | 0.37 % | 07/13/2009 | 40.5% |
| | | | | | |
| JPMorgan SmartRetirement 2045 | 0.53 % | Fidelity Freedom Index 2045 Investor | 0.12 % | 10/02/2009 | 341.7% |
| | 0.53 % | American Funds 2045 Trgt Date Retire R6 | 0.38 % | 07/13/2009 | 39.5% |
| | | | | | |
| JPMorgan SmartRetirement 2050 | 0.53 % | Fidelity Freedom Index 2050 Investor | 0.12 % | 10/02/2009 | 341.7% |
| | 0.53 % | American Funds 2050 Trgt Date Retire R6 | 0.39 % | 07/13/2009 | 35.9% |
| | | | | | |
| JPMorgan SmartRetirement 2040 | 0.53 % | Fidelity Freedom Index 2040 Investor | 0.12 % | 10/02/2009 | 341.7% |
| | 0.53 % | American Funds 2040 Trgt Date Retire R6 | 0.38 % | 07/13/2009 | 39.5% |
| | | | | | |
| JPMorgan SmartRetirement 2025 | 0.49 % | Fidelity Freedom Index 2025 Investor | 0.12 % | 10/02/2009 | 308.3% |
| | 0.49 % | American Funds 2025 Trgt Date Retire R6 | 0.33 % | 07/13/2009 | 48.5% |
| | | | | | |
| JPMorgan SmartRetirement 2020 | 0.44 % | Fidelity Freedom Index 2020 Investor | 0.12 % | 10/02/2009 | 266.7% |
| | 0.44 % | American Funds 2020 Trgt Date Retire R6 | 0.31 % | 07/13/2009 | 41.9% |
| | | | | | |
| JPMorgan SmartRetirement 2030 | 0.51 % | Fidelity Freedom Index 2030 Investor | 0.12 % | 10/02/2009 | 325.0% |
| | 0.51 % | American Funds 2030 Trgt Date Retire R6 | 0.35 % | 07/13/2009 | 45.7% |
| | | | | | |

| JPMorgan SmartRetirement 2055 | 0.53 % | Fidelity Freedom Index 2055 Investor | 0.12 % | 06/01/2011 | 341.7% |
|---|---|---|---|---|---|
| | 0.53 % | American Funds 2055 Trgt Date Retire R6 | 0.40 % | 02/01/2010 | 32.5% |
| | | | | | |
| JPMorgan SmartRetirement 2060 | 0.53 % | Fidelity Freedom Index 2060 Investor | 0.12 % | 08/05/2014 | 341.7% |
| | 0.53 % | American Funds 2060 Trgt Date Retire R6 | 0.41 % | 03/27/2015 | 29.3% |
| | | | | | |
| JPMorgan SmartRetirement Income | 0.38 % | Fidelity Freedom Index Income Investor | 0.12 % | 10/02/2009 | 216.7% |

101.    The above alternative funds outperformed the Plan's funds in their 3 and 5 year average returns as of 2020.  Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.

102.    These results are not surprising given that in the long-term, actively managed funds do not outperform their passively-managed counterparts.  Indeed, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:[11]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark 5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |

---

[11] Source: https://us.spindices.com/spiva/#/reports

| Domestic Equity | S&P Composite 1500 | 81.66 |
|---|---|---|
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 |

103.    A prudent investigation would have revealed the existence of the above lower-cost and better performing alternatives to the Plan's funds.

104.    The above is for illustrative purposes only as the significant fee disparities detailed above existed for all years of the Class Period.  The Plan expense ratios were multiples of what they should have been given the bargaining power available to the Plan fiduciaries.

**B.   Defendants Breached Their Fiduciary Duties by Failing to Include a Stable Value Fund Among the Plan's Investment Options**

105.    Estee Lauder's process for selecting and retaining the Vanguard Federal Money Market Fund, rather than a stable value fund, was deficient.  Indeed, a stable value fund was available from the same fund family – the Vanguard Retirement Savings Trust – that provided substantially higher rates of return without subjecting Plaintiffs and other participants to greater risk.  A stable value fund is a contract-based investment vehicle designed to preserve principal and generate steady rates of return, while allowing participants to make withdrawals at contract value (principal plus accrued income), regardless of market conditions. Had Estee Lauder conducted a reasonable investigation of alternatives to the Vanguard Federal Money Market Fund, it would have seen that this fund was consistently underperforming stable value funds and replaced it.

106.    Stable value funds are a common investment in large defined contribution plans like the Plan—and, in fact, they are designed specifically for such plans.  Stable value funds are

conservatively managed to preserve principal and provide a stable credit rate of interest. And "[b]ecause they hold longer-duration instruments, [stable value funds] generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between. Stable Value and Money Market*, 39 AKRON L. REV. 9, 24 (2006) (In contrast to money market funds, stable value funds "can invest in longer-term financial instruments," and thus, "Stable Value Funds simply outperform Money Market Funds.").

107. In addition to longer duration instruments generating greater returns than money market investments, stable value funds provide a guaranteed rate of return to the investor, referred to as a crediting rate, and protect against the loss of principal and accrued interest. This protection is provided through a wrap contract issued by a bank, insurance company or other financial institution that guarantees the book value of the participant's investment.

108. Specifically, stable value funds are typically structured as: (1) an insurance company general account; (2) an insurance company separate account; or, (3) a synthetic fund. A synthetic stable value fund is a diversified portfolio of fixed income securities and is insulated from interest rate volatilities through wrap contracts with insurers.

109. Synthetic stable value funds are generally the least risky because principal is guaranteed by multiple wrap providers and plan participants own the assets of the underlying funds (general account and separate account investors do not actually own the underlying assets in the separate account). Since the credit crisis of 2008–2009, most large 401(k) and 403(b) plans have divested themselves of general account and separate account products in favor of synthetic stable value funds because of credit risk concerns.

110.     Even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]"  Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS, at 26, 28 (Aug. 2009).[12]

111.     According to a 2015 Stable Value Study published by MetLife, over 80% of plan sponsors offer a stable value fund.  MetLife, *2015 Stable Value Study: A Survey of Plan Sponsors, Stable Value Fund Providers and Advisors*, at 5 (2015).[13]  The study also notes that stable value returns were "***more than double***" the returns of money market funds from 1988 to 2015, and 100% of stable value providers and almost 90% of financial advisors to defined contribution plans "agree that stable value returns have outperformed money market returns over the last 25 years."  *Id*. at 7 (emphasis added).

112.     Unlike the vast majority of large 401(k) plans, the Plan does not offer a stable value fund as its "income producing, low risk, liquid fund."

113.     Instead, during the class period the Plan offered the Vanguard Federal Money Market Fund, which yielded materially lower returns throughout the relevant time period by comparison to typical stable value funds and, thus, was at all times an imprudent retirement investment under ERISA.  Therefore, Defendants violated their duty of prudence under ERISA by including it as a retirement investment option in the Plan's menu of investment options.

114.     As shown in the chart below, stable value funds have provided consistently higher yields than money market peer group averages.[14]

---

[12] *Available at* http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf (last visited July 23, 2020).
[13] Available at:
https://www.metlife.com/content/dam/metlifecom/us/homepage/institutionalRetirement/insights/StableValue/2015-Stable-Value-Study.pdf (last visited July 23, 2020).
[14] Available at:
https://institutional.vanguard.com/VGApp/iip/site/institutional/investments/StableValue?cmpgn=IIGDTGGINVDCLSRCHPSXXTLXXGENAUDDC020200629SVLPXX&msclkid=3b5fde9f94ac14f48d0b81866f024729 (last visited Sept. 20, 2020).



■ Vanguard Retirement Savings Trust
■ U.S. fund prime money market—Peer group average
■ U.S. fund money market—Taxable peer group average

115.    The table below compares returns of the Plan's Vanguard Federal Money Market Fund to stable value funds that would have been readily available to the Plan throughout the Class Period, and to the Hueler Analytics Stable Value Pooled Fund Universe, as of March 31, 2020.

| Fund | 1-year | 3-year | 5-year | 10-year |
|---|---|---|---|---|
| Vanguard Federal Money Market Fund | 1.39 % | 1.62 % | 1.10 % | 0.55 % |
| Invesco Stable Value Trust – Class A1 | 2.57 % | 2.51 % | 2.28 % | 2.16 % |
| Vanguard Retirement Savings Trust | 2.60 % | 2.40 % | 2.30 % | 2.50 % |
| Putnam Stable Value Fund at 15 BPS | 2.55 % | 2.36 % | 2.15 % | 2.39 % |
| Hueler Stable Value Pooled Fund Universe Average | 2.50 % | 2.30 % | 2.10 % | 2.20 % |

116.    Underperformance of a plan's investment choices can have a dramatic effect on the accumulation of an individual's retirement savings.  A difference of only 30 basis points, or three tenths of one percent, is significant in this regard.  Consider an investment of $1000 over 30 years that earns 6.5%.  This investment would have grown to nearly $6,600.  If the same investment only earned 6.2%, the final value would only be $6,050, or 8% less.  An 8% difference translates into one full extra monthly payment each year (1/12 = 8%).  It is the difference, to a participant, of receiving 12 payments per year or 11 payments.  A 30-basis point lower return eliminates an entire month of retirement income when a participant is living off accumulated retirement savings.

117. Hueler Analytics is the industry standard for reporting returns of stable value funds. Hueler data represents a reasonable estimate of the average returns of a typical stable value fund. The returns of the funds in the Hueler universe on average far exceeded the returns of the Vanguard Federal Money Market Fund in the Plan during the Class Period.

118. In light of stable value funds' clear advantages and enhanced returns compared to the Vanguard Federal Money Market Fund, when deciding which fixed income investment option to include in a defined contribution plan, a prudent fiduciary would have included a stable value fund—and not the Vanguard Federal Money Market Fund. Defendants imprudently and disloyally failed to do this.

119. Had the Plan's funds invested in the Vanguard Federal Money Market Fund instead been invested in a stable value fund returning average benchmark returns, as represented by the Hueler Index during the proposed Class Period here, Plaintiffs and other Plan participants would not have lost millions of dollars of their retirement savings, and would not continue to suffer additional losses as a result of the Vanguard Federal Money Market Fund being retained in the Plan.[15]

C. **Defendants Failed to Monitor or Control the Plan's Recordkeeping Expenses**

120. The Plan's recordkeeper since at least 2014 has been Alight Solutions ("Alight"). The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant

---

[15] Plan losses have been brought forward to the present value using the investment returns of the Hueler Index to compensate participants who have not been reimbursed for their losses.

loan processing, QDRO[16] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.

121.    Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly.  Many of these services can be provided by recordkeepers at very little cost.  In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

122.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.  As a result of such competition, vendors vigorously compete for business by offering the best price.

123.    The cost of providing recordkeeping services depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

124.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

125.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays

---

[16] Qualified Domestic Relations Order.

for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at   http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

126.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.  *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (*"Tussey II"*) (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

127.    First, they must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

128.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

129.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d at 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

130.    Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper within the next two years."  These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[17]

131.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps.  For example, as noted above, Alight has been the Plan's recordkeeper since at least 2014 (with no change), and there is no evidence Defendants have undertaken an RFP since 2014 in order to compare Alight's costs with those of others in the marketplace.  Alight's direct compensation for recordkeeping services during the Class Period has been, by any measure, unreasonable.  From 2014 to 2018 the direct annual recordkeeping per participant fees were as follows:

| Year | Direct Recordkeeping Fees |
|------|---------------------------|
| 2014 | $56 |
| 2015 | $38 |
| 2016 | $40 |
| 2017 | $24 |

---

[17] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees/

| 2018 | $48 |
|------|-----|

132.    By way of comparison, we can look at what other plans are paying for recordkeeping.  One data source, the *401k Averages Book* (20th ed. 2020)[18] studies Plan fees for smaller plans, those under $200 million in assets.  Although it studies smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a bigger plan like the Plan should be paying for recordkeeping.  That is because recordkeeping and administrative fees should ***decrease*** as a Plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id*., at p. 108.  Thus, using direct recordkeeping costs to make an apples to apples comparison, the Plan, with over a billion dollars in assets and nearly 17,000 participants during the Class Period, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

133.    Looking at the Plan's total compensation for recordkeeping and administration costs also reveals fiduciary breaches.  The total amount of recordkeeping fees (both through direct and indirect payments) ranged between an estimated $71 and $126 annually per participant during the Class Period with the lone exception in 2017 when per participant fees were $48.

134.    As noted above, some plans pay recordkeepers additional fees on top of direct compensation in the form of revenue sharing, and that was the case with the Plan.  The maximum indirect compensation received by Alight for recordkeeping services can be estimated to a

---

[18] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information." *401k Averages Book* at p. 2.

reasonable degree of certainty using publicly available information[19] because "revenue sharing' is divvied among all the plan's service providers which "could include but are not limited to recordkeepers, advisors and platform providers." *401k Averages Book*, at p. 7, Answer to FAQ No. 14.

135.     If all the indirect revenue sharing reported on the Plan's Form 5500 (or a significant portion) were paid to Alight then, prior to rebates, if any, the annual per participant recordkeeping fee would have been as follows during the Class Period:

| Year | No. of Participants | Direct Costs | Indirect Costs Through Revenue Sharing[20] | P/P Costs |
|------|--------------------|--------------|--------------------------------------------|-----------|
| 2018 | 16741 | $800,632 | $373,253 | $71.12 |
| 2017 | 16261 | $388,821 | $377,332 | $48.12 |
| 2016 | 16257 | $659,933 | $1,170,956 | $113.62 |
| 2015 | 18749 | $723,592 | $1,191,886 | $103.16 |
| 2014 | 15443 | $867,165 | $1,065,852 | $126.17 |

136.     Moreover, other large plans, by asset size, have managed to obtain recordkeeping costs in the range of $35 per participant, a fraction of the cost charged to the Plan's participants.[21]

---

[19] *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

[20] The indirect amounts include a calculation of overall revenue sharing and amounts paid to the Trustee. From 2016 through 2018 the Trustee was Northern Trust and in 2014 and 2015 the Trustee was State Street Bank and Trust Company ("State Street").

[21] Case law is in accord that large plans can bargain for low recordkeeping fees. *See, e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

137.    By way of further comparison, a 1998 study conducted by the Department of Labor ("1998 DOL Study") reflected that as the number of participants grows, a plan can negotiate lower recordkeeping fees:[22]

| Number of Participants | Avg. Cost Per Participant |
|---|---|
| 200 | $42 |
| 500 | $37 |
| 1,000 | $34 |

138.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

139.    A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted separate and independent breaches of the duty of prudence.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Fiduciary Committee and Benefits Committee Defendants)

140.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

141.    At all relevant times, both the Fiduciary and Benefits Committee Defendants (when referred to collectively, "Prudence Defendants" or "Committee Defendants") were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they

---

[22]See https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/ retirement/study-of-401k-plan-fees-and-expenses.pdf. Given the general trend of decreasing recordkeeping fees, the average cost per participant from ***nearly 20 years ago*** cited in the 1998 DOL Study would be much lower today.

exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

142.     As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA Section 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

143.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint.  The Fiduciary Committee Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Fiduciary Committee Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Fiduciary Committee Defendants  also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Fiduciary Committee Defendants failed to investigate certain collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.  Likewise, the Prudence Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

144.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

145.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for the Prudence Defendants' breaches as set forth in their Prayer for Relief.

146.     The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Prudence Defendant is also liable for the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Estee Lauder and the Board Defendants)**

147.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein

148.     Estee Lauder and the Board Defendants when referred to collectively, will be referred to as the "Monitoring Defendants." The Monitoring Defendants had the authority to appoint and remove members of the Prudence Defendants and were aware that the Prudence Defendants ants had critical responsibilities as fiduciaries of the Plan.

149.     In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

150.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

151.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

> (a) Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, imprudent choices of funds' class of shares, and inefficient fund management styles that adversely affected the investment performance of the Funds' and their participants' assets as a result of the Fiduciary Committee Defendants' imprudent actions and omissions;

> (b) Failing to monitor the processes by which Plan investments were evaluated, the Fiduciary Committee Defendants' failure to investigate the availability of lower-cost share classes, and the Committee Defendants' failure to investigate the availability of lower-cost collective trust vehicles; and

> (c) Failing to remove Fiduciary Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan and failure to remove members of Committee Defendants which caused the Plan to pay excessive

recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

(d) In addition, the Monitoring Defendants failed to adequately monitor the actions of the Committee Defendants in selecting and retaining a recordkeeper for the Plan similarly causing the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

152.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

153.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

154.    WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: March 22, 2023                        **CAPOZZI ADLER, P.C.**

*/s/ Donald R. Reavey*
Donald R. Reavey, Esquire
(Admitted by *Pro Hac Vice*)
2933 North Front Street
Harrisburg, PA 17110
Email: donr@capozziadler.com
Telephone: (717) 233-4101
Fax (717) 233-4103

Mark K. Gyandoh, Esquire
(Admitted by *Pro Hac Vice*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
Telephone: (610) 890-0200
Fax (717) 233-4103

*Interim Lead Class Counsel*

Marc H. Edelson, Esquire
(NY ID # 2179646)
Eric Lechtzin, Esquire
(Admitted by *Pro Hac Vice*)
**EDELSON LECHTZIN LLP**
3 Terry Drive, Suite 205
Newtown, PA 18940
Email: medelson@edelson-law.com
              elechtzin@edelson-law.com
Telephone: (215) 867-2399
Facsimile: (267) 685-0676

*Interim Class Counsel Executive Committee*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of March, 2023, I electronically filed a copy of the foregoing with the Clerk of Court using the CM/ECF system which will send a notification to all counsel of record in this Action.

*/s/ Donald R. Reavey*
Donald R. Reavey